JUDGE GARDEPHE

608-09/WLJ/PJG/EJC
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
Tel: (212) 425-1900
Fax: (212) 425-1901
William L. Juska, Jr.
Peter J. Gutowski
Edward J. Carlson



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KOOKYANG SHIPPING CO., LTD.,

    Plaintiff,

 -against-

PT. XENON SUMBER MAKMUR,

    Defendant.

09 CV

VERIFIED COMPLAINT

Plaintiff Kookyang Shipping ("Kookyang"), as and for its Verified Complaint against Defendant PT. Xenon Sumber Makmur ("PT. Xenon"), alleges as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract. This case also falls within this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, *et seq.*, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

### THE PARTIES

2. At all times material hereto, Plaintiff Kookyang was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 2 Floor, New Haenam Bldg., #21, Bukchang-Dong, Chung-Ku, Seoul, Korea.

3.    At all times material hereto, Defendant PT. Xenon was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at Plaza Bumidaya 18th Floor, Jl. Imam Bonjol No. 16, Jakarta, Indonesia, 10310.

## THE NATURE OF THE CLAIM

4.    This complaint involves three contracts: a voyage charter Plaintiff Kookyang entered with Defendant PT. Xenon, which contract Defendant breached and/or repudiated; a head time charter Plaintiff Kookyang entered with nonparty vessel owner Daeyang Shipping Co. Ltd. regarding the M/V TOPEKA; and, a time charter Plaintiff Kookyang entered with nonparty NCS Shipping Fareast Company to mitigate its losses resulting from Defendant PT. Xenon's breach and/or repudiation of the August 5, 2009 charter.

5.    Plaintiff Kookyang is a Korean corporation engaged in the business of chartering oceangoing vessels for the international transportation of bulk cargos, including coal.

6.    On August 5, 2009, Plaintiff Kookyang entered a maritime contract with Defendant PT. Xenon for the ocean transportation of about 60,000 metric tons of coal from Taboneo, Indonesia to Dangjin, Korea. (See fixture recap at Exhibit A.)

7.    Pursuant to the agreement, the parties agreed to a freight rate of $12.40 per metric ton, with Defendant PT. Xenon obligated to pay Plaintiff Kookyang 30 percent of the total freight before the voyage commenced.

8.    In order to fulfill its obligation to Defendant, Plaintiff Kookyang entered the market to procure a vessel, and on August 11, 2009, entered into a contract with non-party vessel owner Daeyang Shipping Co. Ltd. ("Daeyang") for the charter of the M/V TOPEKA. (See Exhibit B).

9.    Via a series of emails between Plaintiff Kookyang and Defendant PT. Xenon, Plaintiff nominated the M/V TOPEKA for the performance of its contract with Defendant, which nomination Defendant accepted. (See communications at Exhibit C).

10.    Plaintiff's contract with Daeyang set forth two rates of hire for the M/V TOPEKA: $18,600 per day between August 18, 2009 and September 16, 2009, and $37,296.88 per day thereafter.

11.    Plaintiff Kookyang took delivery of the M/V TOPEKA on August 18, 2009 at Taiwan and prepared for steaming to Taboneo, Indonesia, the designated loading port for Defendant's cargo of coal.

12.    On August 19, 2009, and in breach of its contractual obligations to Plaintiff, Defendant PT. Xenon unilaterally repudiated its contract with Plaintiff.

13.    In order to mitigate its losses resulting from Defendants breach and/or repudiation of the contract, on August 21, 2009, Plaintiff Kookyang chartered the M/V TOPEKA to NCS Shipping Fareast Company ("NCS") for 25 to 30 days at the net hire rate of $15,500 per day (see August 21, 2009 contract at Exhibit D).

14.    That contract is currently being performed, and Plaintiff estimates it will redeliver the vessel to owner Daeyang on our about October 8, 2009.

15.    Plaintiff Kookyang's mitigation of its losses resulting from Defendant's breach has exposed Plaintiff to higher daily charter rates for the use of the vessel, which rates Plaintiff has paid to Daeyang.

16.    Plaintiff Kookyang's damages are thus calculated by subtracting the amount of hire it earned under its contract with NCS from the amount of hire due to owner Daeyang plus

Plaintiff's lost profits resulting from Defendant's unilateral breach and/or repudiation of the August 5, 2009 contract.

17.    Specifically, Plaintiff Kookyang earned $628,351.81 in charter hire from its August 21, 2009 mitigation contract with NCS, minus commission and brokerage fees.

18.    However, as a result of entering that contract with NCS, Plaintiff Kookyang incurred a total of $1,408,776.81 in charter hire due to owner Daeyang.

19.    By mitigating its losses, therefore, Plaintiff Kookyang incurred a loss of $628,351.81.

20.    In addition, had Defendant PT. Xenon performed the August 5, 2009 contract, Plaintiff would have earned a profit of $100,830, based upon the difference between the amount Plaintiff would have had to pay to Daeyang and the sums payable from the Defendant.

21.    Therefore, as the result of Defendant PT. Xenon's breach and/or repudiation of its contract with Plaintiff Kookyang, Plaintiff Kookyang has suffered total damages of $729,181.81.

22.    This action is also brought to obtain jurisdiction over the Defendant and in aid of future litigation in this forum.

23.    In addition, Plaintiff seeks interest in the amount of $131,252.72, calculated on the sum of $729,181.81 at the rate of 9 percent per annum, the statutory interest rate in the State of New York, for two years, the estimated time it will take Plaintiff to obtain a final judgment against the Defendant for its breach of contract.

24.    In all, the claim for which Plaintiff sues in this action, as near as presently may be computed, totals $860,434.53.


### REQUEST FOR RULE B RELIEF

25.   Defendant PT. Xenon actively mines, produces and exports coal from Indonesia by sea.

26.   Defendant is also a joint operator of large coal mining operations in Indonesia, pursuant to which Defendant charters oceangoing vessels for the export of coal from Indonesia.

27.   Since most vessel charters call for the payment of hire and/or freight in U.S. dollars denominations, and since Defendant PT. Xenon is reported to be actively chartering vessels, it is likely that Defendant will soon engage in financial transactions that require the making of payment(s) to vessel owners via U.S. dollar-denominated electronic funds transfers.

29.   Upon information and belief, U.S. Dollar payments made in international commercial transactions of the type entered by Defendant PT. Xenon are frequently made via electronic funds transfers. Approximately 95% of all electronic funds transfers in U.S. dollars between foreign entities are processed through the Clearing House Interbank Payments System ("CHIPS"). In order to convert a foreign currency into U.S. dollars, payments are routed through a participating CHIPS bank, usually located in New York City.

30.   Upon information and belief, because Defendant PT. Xenon is, and will continue to be during the pendency of this litigation, engaged in international maritime commerce, it will make or receive some payments in U.S dollars, some of which will be in the form of electronic funds transfers through a CHIPS bank, usually located in New York City, within this District.

31.   Electronic funds transfers to or from a party in the hands of an intermediary bank have been held to constitute an attachable asset of that party and can be restrained pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F3d 434, 436 (2d Cir, 2006).

32.    Accordingly, upon information and belief, Defendant PT. Xenon has or will have during the pendency of this litigation assets in the District in the form of electronic funds transfers at banks located in New York City.

33.    Upon information and belief, and after investigation, PT. Xenon cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due to, from, or for the benefit of the Defendant (hereinafter, "ASSETS"), including but not limited to "ASSETS" at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

WHEREFORE, Plaintiff Kookyang prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing them to appear and answer the foregoing, failing which default may be taken against them;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B all tangible or intangible property of Defendant up to and including the sum of $860,434.53 be restrained and attached, including, but not limited to, any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due, held or being transferred to or for the benefit of Defendant, or any of them, at, moving through or being transferred and/or wired

to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.  That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary; and

d.  For such other, further and different relief, including attorneys' fees, interest, costs and disbursements, as this Court may deem just and proper, and/or a default with respect to any property seized in the event a timely response is not filed.

Dated: New York, New York
September 22, 2009

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
Kookyang Shipping Co., Ltd.

By: _____
William L. Juska, Jr.
Peter J. Gutowski
Edward J. Carlson
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

**ATTORNEY VERIFICATION**

State of New York    )
                     ) ss.:
County of New York   )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.    I am a partner in the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

Peter J. Gutowski

Sworn to before me this
22ND day of September, 2009

Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4931490
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009



Exhibit A

# FIXTURE NOTE

DATE : 5TH AUGUST, 2009

IT IS THIS DAY MUTUALLY AGREED AND CONFIRMED BY AND BETWEEN THE UNDER-SIGNED PARTIES FIXTURE NOTE OF CHARTER OF THE FOLLOWING TERMS AND CONDITIONS :

1. VESSEL : M.V. YUE DIAN 7 OR SUB.
   CALL SIGN: BMV1 PRC FLAG
   BUILDER: BURMEISTER &WAIN SHIPYARD COPENHAGEN
   DATE OF BUILT: 1995, JULY
   REGISTRY PORT: SHENZHEN
   GROSS TONNAGE: 39, 279
   NET TONNAGE: 24, 360
   D.W. (DEAD WEIGHT): 75,100MT
   L.O.A.: 225  L.B.P.: 221
   T (FULL LOAD DRAFT): 14.332M
   BREATH: 32.24M
   DEPTH: 19.7M
   HOLD CAPACITY (GRAIN): 85,158 CBM
   HOLD/HATCH: 7HO/7HA
   HOLD SIZE: NO.1:16.2×41.2
   NO.2-7:16.2×44.6   A,B,A

2. ACCT/CHARTERERS:  PT. XENON SUMBER MAKMUR

3. CARGO: 60,000 MT/10% MORE OR LESS OWS OPTION

4. LOADPORT - 1SP, 1SB/ANCH  TAHONEO, INDONESIA

5. DISCHARGE PORT : 1SP 1SB DANGJIN, S.KOREA

6. LAYCAN : 18TH-25TH. AUG. 2009

7. FRT : USD 12.40 PMT ON FIOST BSS 1/1

8. 1) CHRS TO REMIT TO OWS NOMI BANK 30% OF TOTAL FREIGHT AFTER VSL'S IOP AT LAST PORT BOUND FOR LOADING PORT.
   2) BALANCE FREIGHT TO BE PAID LESS COMMISSION TT TO OWNERS NOMINATED BANK ACCOUNT WITHIN 3 (THREE) BANKING DAYS AFTER COMPLETION OF LOADING S/R B/L TO  CHRS / SHIPPER

9. LOAD RATE: 16,000MT /DAY WWD OF 24 CONSECUTIVE HRS SSHINC

10. DISCH RATE: 22,000MT /DAY WWD OF 24 CONSECUTIVE HRS SSHINC

11. DEM RATE : USD 17,500 PER DAY PRO RATA, DESPATCH : HALF OF DEMURRAGE BASIS WORKING TIME SAVED, DEMURRAGE/DESPATCH TO BE SETTLED WITHIN 10 DAYS AFTER COMPLETION OF DISCHARGING AND SUBMISSION OF RELEVANT DOCUMENTS I.E OF /NOR /LAYTIME SHEET DULY SIGNED BY THE AGENTS AND MASTER.

12. AGENTS: OWS NOMINATED AGENT AT BOTH ENDS

--- 1 / 2 ---

13. STEVEDORES SHALL LOAD AND DISCHARGE THE CARGO IN ACCORDANCE WITH MASTER'S INSTRUCTIONS AND SUPERVISION. IN CASE OF STEVEDORE DAMAGE TO THE VESSEL, MASTER TO NOTIFY THE STEVEDORES OF DAMAGE IN WRITING WITHIN 24 HOURS OF ITS OCCURRENCE. STEVEDORES' DAMAGE, IF ANY, TO BE SETTLED DIRECTLY BETWEEN OWNERS AND STEVEDORES WITHOUT CHARTERERS INTERFERENCE.

14. IN CASE ORIGINAL B/LS NOT AVAILABLE AT DISPORT, OWNERS/MASTER SHALL ALLOW TO DISCHARGE / RELEASE CARGO TO CNEES/RCVRS AGAINST CHRTS/RCVRS SINGLE LOI AS PER OWNER'S P AND I CLUB WORDING FORMAT WITHOUT BANK ENDORSEMENT.

15. MASTER TO SIGN OR TO AUTHORISE AGENTS TO SIGN AND RELEASE OF BS/L IN STRICT CONFIRMITY WITH THE MATES RECEIPT, CONCERN BS/L TO BE USED

16. ANY TAXES, DUES ON VSL AND ON FRT TO BE FOR OWNERS A/C.

17. ANY TAXES, DUES ON CARGO TO BE FOR CNTRS A/C.

18. MASTER / OWNERS / THEIR AGENTS TO PROVIDE ETA LOADPORT UPON FIXING AND THEREAFTER 7/5/3/2/1 DAYS NOTICES ETA TO CHARTERERS / AGENTS / SHIPPERS, UPON SAILING FROM LOADPORT AND THEREAFTER 5/3/2/1 DAYS NOTICE OF ETA AT DISCHARGE PORT(S)

19. NOTICE OF READINESS SHALL BE TENDERED BOTH ENDS IN FREE PRATIQUE, WITH CLEAN HOLDS HATCH AND TO BE TENDERED UPON VESSEL'S ARRIVAL WICCON, WIFPON, WIPON, WIBON LAYTIME FOR LOADING / DISCHARGING TO COMMENCE 12 RUNNING HRS AFTER TENDERING OF NOR. IN THE EVENT THAT THE VESSEL IS NOT READY THEN A NEW NOR TO BE TENDERED.

20. O&P (OVERAGE PREMIUM) IF ANY TO BE ON CNTRS ACCT

21. GA/ARBI. IF ANY KOREAN LAW TO APPLY. GENCON 1994 GA AND ARBITRATION CLAUSE TO BE APPLIED.

22. SUBJECT CHRTERS PROFMA GENCON CP WITH LOGICAL AMENDMENT AS PER MAIN TERMS DISCUSSED.

23. CHRS GUARANTEE/ASSURE TO PROVIDE SUITABLE CARGO'S TRL CERTIFICATES FOR OWS/MASTER'S APPROVAL BF LOADING COMMENCEMENT. CHRS GUARANTEE/ASSURE ALL CARGO TB LOADED ON BOARD WHICH IS FULLY COMPLIED WITH IMO REGULATION AND IG CODE.

24. LIGHTERAGE / LIGHTNING IF ANY TO BE FOR CHARTERER'S ACCOUNT AND ARRANGEMENT BOTH ENDS.

25. CARGO QUANTITY TO BE CERTIFIED BY DRAFT SURVEYS BOTH ENDS WHICH TO BE ARRANGED BY CHARTERERS AT THEIR A/C.

26. COMMISSION 1.25% TO BE PAYABLE TO UNI ENTERPRISE BY OWNERS.+ 2.5% TO UNI ENTERPRISE

FOR AND ON BEHALF OF CHARTERERS
PT. XENON SURFER MARINA

FOR AND ON BEHALF OF OWNERS
KOCKYANG SHIPPING CO., LTD.



Exhibit B

**MAZZA, CLARE**

| | |
|---|---|
| From: | Ace Chartering Corp. [ace@acechartering.com] |
| Sent: | Wednesday, August 12, 2009 4:28 AM |
| To: | ㅁㅁ ㅁㅁㅁ - ㅁㅁㅁㅁ |
| Cc: | ㅁㅁㅁㅁ |
| Subject: | RE: MV TOPEKA / KOOKYANG - CLEAN RECAP |

ACE CHARTERING CORPORATION, SEOUL
TEL : +82 2 755 2100 (REP) / FAX : +82 2 755 2120 E-MAIL : ace@acechartering.com /
ops@acechartering.com =============================================================

ATTN : ㅣㅣ ㅁ ㅁ ㅁㅁㅁ

RE : MV TOPEKA / KOOKYANG - CPDD 11TH AUG., 2009 ==

PLSD TO RECAP CLEAN FIXTURE ASF : -

// STR TOP P+C //

MV. TOPEKA
----------
74,710 MT DWT ON ABT 14.26B M SSW
TPC 67.07
MALTA FLG - BLT 2001
LOA/BEAM 32.26 M / 225 M
7 HO / 7 HA
91,717.3 CBM GRAIN CAPACITY
SPEED / CONS UPTO AND INCL BEAUFORT 4 AND DOUGLAS SEASTATE 3 :
ABT 14 KTS ON ABT 34 / 31 MT IFO 380 L/B NDAS IN PORT ABT 2.5 MT  MDO (ALL DETS +ABT+)

FOR

1. ACCT : KOOKYANG SHIPPING CO., LTD.

2. DELY : DLOSP 1SP TAIWAN ATDNSHINC

3. LAY/CAN : 00:01 HRS 15TH / 12:00 HRS 19TH AUG., 2009

4. ONE TCT VIA SA(S),SB(S),SP(S) AA,AWIWL VIA TABONEO, INDONESIA TO DANGJIN, KOREA
   WITH LAWFUL/HARMLESS COAL IN BULK. EST DUR ABT 25 DAYS WOG

5. REDEL : DLOSP 1SP DANGJIN, S.KOREA PICO ATDNSHINC

6. HIRE : USD 18,600 DIOT

7. 1ST HIRE 20 DAYS WITH ETIMATED CONSUMABLE BUNKER VALUE TO BE PAID
   W/I 3 BANKING DAYS FM DELY.

   CHRTRS HAVE THE RIGHT TO DEDUCT BOR VALUE FM LAST SUFFICIENT HIRE.

8. ILOHC : USD 4,500 LUMPSUM
   C/E/V : USD 1,300 PMPR

9. BUNKER CLS :
   BOD: IFO ABT 1250/1350MT, MDO ABT 65/75 MT

1

BUNKER ON REDLY; ABT SAME QUANTITY AS ON DELY
BUNKER PRICE BENDS: IFO USD 460PMT MDO USD 600PMT

10. THE VESSEL'S HOLDS ON ARRIVAL FIRST LOADPORT TO BE CLEAN, SWEPT, AND
    DRIED UP AND READY TO RECEIVE CHARTERERS' INTENDED CARGO AND SHOULD
    PASS THE INDEPENDENT SURVEYOR'S INSPECTION. IF VESSEL FAILS TO PASS
    HOLD INSPECTION, VESSEL TO BE PUT OFF-HIRE FROM THE TIME OF FAILING
    OF CARGO HOLD INSPECTION UNTIL PASSING RE-INSPECTION AND DIRECTLY
    TIME/EXPENSES CAUSED THEREBY TO BE FOR OWNRS ACCOUNT.

11. IF THE ORIGINAL B/L CAN NOT BE PRESENTED AT DISPT, OWRS/MSTR
    AGREE TO DISCHG/RELEASE THE ENTIRE CGO W/OUT PRESENTATION OF
    THE ORIGINAL BSL AGAINST CHTS LOI IN OWRS STANDARD PNI FORM
    SIGND BY CHTRS ONLY.

12. GA/ARBITRATION LONDON, ENGLISH LAW TO APPLY

13. 2.5 PCT ADD COMM

14. O'WISE AS PER CP MV. TOPEKA DTD 11TH. JUL. 2007, WITH LOGICAL
    AMENDMENTS REFLECTING TO THIS VSL/FIXTURE AS PER MAIN TERMS RECAP AND FOLL
    FURTHER ALTERATIONS:

<RIDER>

-AMEND CL.60 - NOTICE
Delivery : ows to give chtrss th following notices. :
5/3/2/1 day(s) notice of delivery date and place Redelvery : chtrs to give ows the
following notices
7/5/3/2/1 day(s) notice of delivery date and place


- DEL CL.61 : TO READ "DRYDOCK IN CASE OF EMERGENCY ONLY"
=END RECAP=


□□□□□□□. □□□□□.


Thks  &  B.Regards  /  Ace Chartering Corp.
----------------------------------------------------
□ □□    DIR) 755 2174 / MOB) 010 9028 9899 / MSN) pointseo@hotmail.com

DUPLICATE    ADDENDUM NO. 1    

M.V. Topeka / Kookyang Shipping
Charter Party dated 11th August 2009

24th August 2009

It is mutually agreed between Daeyang Shipping Co., Ltd, of Seoul, Korea as Owners, and Kookyang Shipping Co., Ltd, of Seoul, Korea as Charterers, under the above Charter Party that the agreement to be amended as follows:-

A. Instead of the originally agreed terms of the Charter Party; "ONE TCT VIA SA(S),SB(S),SP(S) AA, AWIWL VIA TABONEO, INDONESIA TO DANGJIN, KOREA WITH LAWFUL/HARMLESS COAL IN BULK. EST DUR ABT 25 DAYS WOG", charterers to perform a voyage on the revised terms of : "ONE TCT VIA SA(S),SB(S),SP(S)  AA,AWIWL VIA EC.INDIA (INT. KRISHPATNAM) TO SPORE/JAPAN RANGE (INT. CHINA) WITH LAWFUL/HARMLESS IRON ORE IN BULK. EST. DUR 30 DAYS."

B. Instead of the originally agreed terms of the Charter Party, "REDEL : DLOSP 1SP DANGJIN, S.KOREA PICO ATDNSHINC, charterers to perform a voyage on the revised terms of "REDEL : DLOSP 1SP SPORE/JAPAN RANGE PICO(INT. CHINESE PORT) ATDNSHINC "

C. Daily hire to be adjusted to $37,296.88 net from 0001 hrs GMT on the 16th September 2009 until the actual time / date of vessel's redelivery.

All other terms and conditions to be as per the Charter Party dated 11th August 2009,

CHARTERERS OWNERS                    OWNERS

서울特別市 中區 北倉洞 2J番地          서울특별시 중구 다동 111번지
國陽海運株式會社                       대양상선주식회사
代表運事 嚴 鍾 植                       대표이사 정 유 근



Kookyang Shipping Co., Ltd.              Daeyang Shipping Co., Ltd



# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in Oslo ......................................................... 11th .. day of July, 2007 ................ 19....

2  Between *Messrs. Daeyang Shipping Co., Ltd, Korea*

3  Owners of the good ......................... Steamship/Motorship *"GIANFRANCA D'AMATO"* - Vessel's description as per Clause 29 of .........

4  of .................................................. ~~tons gross register, and ..................................... tons net register, having engines of ......................... indicated horse power~~

5  ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed .........................~~

6  ~~at .............................. of about .............................. cubic feet bale capacity, and about .............................. tons of 2240 lbs.~~

7  ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~

8  ~~allowing a minimum of fifty tons) on a draft of .............................. feet .............................. inches on .............................. Summer freeboard, inclusive of permanent bunkers,~~

9  ~~which are of the capacity of about .............................. tons of fuel, and capable of steaming, fully laden, under good weather~~

10  ~~conditions about .............................. knots on a consumption of about .............................. tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11  now trading ..........................................................................................................................................................

12  .............................. and Messrs. .............................................................................. Charterers of the City of *London* ..........................

13  ## Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *a time-charter period of minimum months to about months in Charterers' option* ..........................

15  ..........................................................................................................................................................

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party.

18  Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Skaw/Passero range or in Owners'*

19  *option on dropping last outward sea pilot Aden/passing Muscat outbound range or Singapore/Japan range at any time day or*

19  *night, Sundays and holidays included in Owners option.*

20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6) as~~

21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be~~

22  ready to receive *any permissible* cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches ~~and~~

23  ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

24  ~~time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed,~~ in carrying lawful merchan-

25  dise, including petroleum or its products, in proper containers, excluding *See Clause 59* ..............................................................

26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27  ~~all necessary fittings and other requirements to be for account of Charterers)~~ in such lawful trades, between safe port and/or ports in British North

28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29  ~~Mexico, and/or South America~~ *always safely afloat, via safe port(s), safe berth(s), safe anchorage(s), always within Institute Warranty*

29  *Limits - See also Clauses 55 and 58.* ~~and/or Europe~~

30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand~~ but excluding Magdalen River, River St. Lawrence between

31  ~~October 31st and May 15th,~~ Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic

32  ..........................................................................................................................................................

33  ..........................................................................................................................................................

34  ..........................................................................................................................................................

35  as the Charterers or their Agents shall direct, on the following conditions:

36  1.  That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; *and all other charges related to the Master, Officers and crew,* shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water, *also for garbage removal, lubricating oil* and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39  2.  That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary Pilotages, Agencies, Canal Tolls,* Commissions,

40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated; but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44  ~~of six months or more.~~

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3.  ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49  ~~board the vessel at the current prices in the respective ports; the vessel to be delivered with not less than .............................. tons and not more than~~

50  *See Clause 43.* ~~Any vessel to be re-delivered with not less than .............................. tons and not more than .............................. tons.~~

51  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 38.* ..............................

52 ........................in United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53 stores; on .........................summer freeboard per Calendar Month, commencing on and from the day *and time* of her delivery, as aforesaid, and at
54 and after the same rate for any part of a *daymonth*, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) *at See Clause 73* ..................................................................

56 ...................................................unless otherwise mutually agreed. Charterers are to give Owners not less than ...............days
57 notice of vessels expected date of re-delivery, and probable port. *See Clause 60.*

58    5.    Payment of said hire to be made in New York in cash in United States Currency, *15 days* semi-monthly in advance, and for the last *15 days half*
59 *month or*
60 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
62 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
63 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *vessel's delivery,7 a.m. on the working day*
64 following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers, they
65 to have the privilege of using vessel at once, each time used to count as hire.
66    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
67 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
68 of such advances. *Advances not to exceed USD 1,000.00 per port unless Owners' prior approval obtained.*
69    6.    That the cargo or cargoes be loaded and/or discharged in any dock or at any wharf or anchorage or place that Charterers or their Agents may
70 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in Argentina, Uruguay and Brazil, where it is customary*
71 *for vessels of similar size, dimensions and draft vessels to safely*
72 lie aground.
73    7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
74 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
75 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodation allow. Charterers
76 paying Owners ........................................per day per passenger for accommodations and meals. However, It is agreed that in no case fines or extra expenses are
77 incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense: *No passengers.*
78    8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew *equipment* and
79 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
80 agency, and Charterers are to load, stow, and trim the cargo at their expense under the supervision *and directions* of the Captain, who is to sign *or is to*
81 *authorise Charterers to sign* Bills of Lading for
82 cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
83    9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
84 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
85    10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
86 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
87 rate of $15.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
88 Clerks, Stevedore's Foreman, etc., Charterers paying *as per Clause 80* at the current rate per meal, for all such victualling.
89    11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
90 Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
91 terers, their Agents or Supercargo, when required, with a true copy of Daily Logs, showing the course of the vessel and distance run and the con-
92 sumption of fuel.
93    12.    That the Captain shall use diligence in caring for the ventilation of the cargo.
94    13.    That the Charterers shall have the option of continuing this charter for a further period of ...............................................

95 on giving written notice thereof to the Owners or their Agents ...............................................days previous to the expiration of the first named term, or any declared option.
96    14.    That if required by Charterers, time not to commence before, ...............................................and should vessel
    not have given written notice of readiness on or before ...............................................but not later than 4 p.m. Charterers or
    their Agents to have the option of cancelling this Charter at any one not later than the day of vessel's readiness.
    *The layean to be narrowed by Owners to 15 days spread latest 20 days prior the first layday narrowed to and subsequently*
    *Owners to narrow to 10 days spread latest 15 days prior to the first layday narrowed to.*
97    15.    That in the event of the loss of time from deficiency, sickness, strike, accident or default of Master, Officers, or crew, of men or
98 deficiency of stores, fire, breakdown or damage to hull, machinery or equipment,
99 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
    preventing the full use of the vessel to the Charterers working of the vessel, the payment of hire *and overtime* shall cease for the time thereby lost;
    *and all extra expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account;* and
100 if upon the voyage the speed be reduced by
101 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
102 thereof, and all extra expenses shall be deducted from the hire.
103    16.    That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
104 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
105 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
106    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
    purpose of saving life and property. *In case of property Owners and Charterers to equally return of salvage.*
107    17.    That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *two*three persons at Londonin New York,
108 one to be appointed by each of the parties hereto, and *an Umpire*the third by the two so chosen; their decision or that *of the Umpire*any two of them, shall be
    final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men *conversant with shipping*
    matters.

110  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-freecharter hire* for any amounts due under this Charter, including
General Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.

114  19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, according to *Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of*
116  York-Antwerp Rules *1974 as amended 1990 at London and any subsequent amendments thereto.* 1924, at such port or place in the United
States as may be selected by the carrier, and as to matters not provided for by these

117  Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120  bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125  United States money.

126  In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever,
127  whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the
128  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131  ships belonged to strangers.

132  Provisions as to General Average in accordance with the *New Jason Clause, as attached,* above are to be included in all bills of lading issued
hereunder.

133  20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.

135  21.  That as Charterers may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138  *See Clause 61.*

139

140  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141  providing *mooring* ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide *free of expense sufficient electro lighting*
*with vessel's light, light clusters to permit work at hatches and over board at the same time.* On the vessel lanterns and oil for
143  night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144  Charterers to have the use of any gear on board the vessel.

145  23.  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging.
146  Steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147  deck-hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148  port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149  insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby.

151  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder: *See Clause 57.*

155  **U.S.A. Clause Paramount**
156  This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157  16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159  be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160  **Both to Blame Collision Clause**
161  If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162  Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163  hereunder will indemnify the Carrier against all loss or liability to the other non-carrying ship or her owners in so far as such loss
164  or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other non
165  carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166  owners as part of their claim against the carrying ship or carrier.

167  25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging. *In no case vessel is to be required to force ice nor to follow ice-breakers.*

170  26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *her seaworthiness and maintenance,* acts of pilots and tugboats, insurance, crew, and all other matters, same as when
trading for their own account.

172  27.  A commission of *1,25 2-1/2* per cent is payable to the Vessel and Owners to

173
174  on hire earned item paid under this Charter, and also upon any continuation or extension of this Charter.
175  28.  An address commission of *3,75 2-1/2* per cent payable to *Charterers* .................................... on the hire earned and paid under this Charter.

*Additional Clauses 29-95, both inclusive, as attached hereto, are deemed to be fully incorporated in this Charter Party.*

*The Owners:*                                           *The Charterers:*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

**Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

## CLAUSE 29 – VESSEL'S DESCRIPTION

Owners have the option to sell the vessel, flag – crew will change accordingly
(without guarantee intention new Greek owners, and intention Malta flag).

M/V "GIANFRANCA D'AMATO (TBRN)
DWT 74,710 metric tons on 14,268 meters SSW
LOA 225.00 meters / Beam 32.26 meters

Flag Italian – International Register
Port of Registry Napoli N. 137 Inter. Reg.
Year built 2001
Delivered 19th February 2001
Yard Hudong Shipyard - Shanghai (H 1275 A)

GT/NT about 40562 / 26139 International
GT/NT about 41960 / 37620 Suez
PC/UMS 33550 Panama
Grain capacity 91,717,1 M3 (3.288,959,5 cubic feet)

Holds grain capacity :
1 - 11.305,4 (399.244,7)   2 - 13.536,9 (478.051,9)
3 - 13.548,7 (478.466,8)   4 - 13.548,7 (478.466,8)
5 - 13.548,7 (478.466,8)   6 - 13.548,7 (478.466,8)
7 - 12.680,2 (447.795,7)

Hatches Dimensions
1 -              14,620 M X 13,20 M
2/3/4/5/6/7      14,620 M X 15,00 M

Holds are CO2 fitted
Main engine MAN BW 5S60MC-C 8791 kw at 98 RPM

Speed / consumptions :
(basis upto and including Beaufort 4 and Douglas Sea State 3)
14 knots on about 34 MT laden / about 31 MT ballast no diesel oil at sea in port about 2,5 MT
MDO ;

Fuel specs :    IFO 380 CST 8217/1996 RMG 95
                MDO ISO 8217/1996 (E) DMB
Always basis Beaufort 4 and Seastate 3
Class Society ABS+KINA – +100A, 1.1, 1L, HCE, ESP, CB2, IWS, TMS, IAQI

**⚓ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

Call sign IBOK
IMO Number 9225196
RINA Number 7/6/3

Telephone :  324 798 015
Fax :       324 798 017
Telex :     624 798 019
E-MAIL :    gianfdam@lee-raisting.de
Crew :      17 Philippinos / 4 Italian

*All details including answers to Technical Questionnaire are " about "*

- (Vessel to be fully I.S.M. and C.O.F.R. covered for trading within limits ;)

- Vessel to use diesel oil for manoeuvring in restricted water, transiting Suez / Panama and other canals and entering into / sailing from port and when on standby unless it is customary and or safe for vessel to use IFO in which case Master to use the latter.

- The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which confirm to the specification(s) as per Vessel's Description.

   The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuel or fuels not complying with the agreed specification(s).

   Additionally, if bunker supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the vessel's engines or auxiliaries, the Owners shall not be held responsible for any reduction in the vessel's speed performance and / or increased bunker consumption, nor for any time lost and any other consequences.

## CLAUSE 30 – BANK DETAILS

Hire is payable by Swift transfer to:

   Bank details to be advised later.

## CLAUSE 31 – PAYMENT

Referring to lines 60 and 61, where there is any failure to make "punctual and regular payment", due to oversight or negligence or error or omission of Charterers' employees, bankers or agents, Owners shall notify Charterers in writing whereupon Charterers will have three (3) banking days to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

2

**⚓ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

### CLAUSE 32

Charterers to have the right to withhold from Charter hire during the period of this Charter, such amount due to off-hire and Owners' disbursements, but properly substantiated. Charterers to have the right to withhold from last hire payments Owners' estimated advances and disbursements, including any fines and any other accounts for Owners' account and also the value of the estimated quantity of bunkers on redelivery. However, final accounting to be arranged by Charterers as promptly as possible.

### CLAUSE 33

In the event of the vessel being boycotted by I.T.F., delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, Ownership, crew, terms of employment of Officers or crew, or any other vessel under the same Ownership, operation or control, all time lost is to be considered as off-hire, and expenses and liabilities incurred thereby to be for Owners' account.

### CLAUSE 34

Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra expenses and consequential actual losses which proved by Charterers shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their Agents, or by reason of cargo carried.

### CLAUSE 35

Any delay, expenses and/or fines incurred on account of smuggling, to be for Charterers' account if caused by Charterers or by Charterers' servants and to be for Owners' account if caused by Master, Officers, crew or Owners' servants.

### CLAUSE 36

Charterers to have the options to add any off-hire time to the Charter period, but same option to be declared latest four (4) months prior to redelivery.

### CLAUSE 37

Any delay, expense or consequential loss by reason of non-compliance with regulations, lack of proper documentation of equipment as per Clauses No. 29 and 46 to 54 or on any breach of said Clauses to be for Owners' account.

3

**⚓ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

## CLAUSE 38 – HIRE

## CLAUSE 39

If stevedore, longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with Clause 50, or because of lack of said certificates, any time so lost shall be treated as off-hire, and all extra expenses incurred, directly resulting from such failure, shall be for Owners' account.

## CLAUSE 40

Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant positions form the destination and the voyage resumed therefrom. All fuel used by the vessel while off-hire shall be for Owners' account.

## CLAUSE 41

If vessel is off-hire consecutively for thirty (30) days or more due to any cause(s) other than Charterers' responsibility, the Charterers shall have the option to cancel this Charter Party without prejudice to any other rights, remedies or claims which the Charterers may have.

## CLAUSE 42

Hire as specified in line 51 to include among other operations usually performed by the crew unless prohibited by shore regulations such as:

- Opening an/or closing of hatches;
- Watchmen in holds for supervision of loading and discharging;
- Assisting when vessel is docking/undocking/ballasting and bunkering;
- Shape up hatches/Holds as much a possible prior to arrival at loading and/or discharging ports/docks/anchorage, so that loading and/or discharging operations can commence immediately;
- Shifting and warping of the ship during loading and/or discharging;
- All overtime of officers and crew;

4

**⚓ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

—  When certain of the above are prohibited by shore labour regulations, the
Master shall comply with such regulations but shall use his best endeavour to
perform the services at sea whenever possible, otherwise to use shore labour at
Charterers' time and expenses, but only with Charterers' prior written
approval.

## CLAUSE 43 – BUNKER CLAUSE

Bunkers on delivery to be about                    ) metric tons IFO and about
metric tons MDO.

Bunkers on redelivery to be about same quantities as actually on board on delivery.

Prices both ends:
        .– per metric ton for IFO, and
        · per metric ton for MDO.

## CLAUSE 44

Charterers to have the privilege to bunker vessel prior delivery provided the
bunkering does not interfere with discharging operations. Similar privilege is granted
to Owners prior redelivery.

## CLAUSE 45

Owners to warrant that vessel is eligible and equipped to bunker in the USA, its
territories and possessions and in all countries to which vessel is allowed to trade
under this Charter.

## CLAUSE 46 ·

The Owners are to provide and keep on board valid derating exemption certificate
throughout the Charter period. Deratization shall always be for Owners' account.

## CLAUSE 47

Throughout the period of the Charter, vessel to be in possession of all necessary valid
equipment and certificates to comply with Safety and Health Regulations, national
and international regulations and all current requirements at all ports of call, Panama
and Suez Canal included.

## CLAUSE 48

For the carriage of grain in bulk, vessel to have on board throughout this Charter
period valid documents and certificates issued by the classification Society and/or

**Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

national Authority and accepted by National Cargo Bureau Ministry of Transport on the basis of the Solas 1974 Regulations and latest amendments thereto.

## CLAUSE 49

Vessel to be fit for grab discharge and no cargo to be loaded in places inaccessible to grabs or in deep-tanks. Charterers to have the privilege of using bulldozers in vessel's holds. However, unit weight of bulldozers will not exceed vessel's tank-top strength.

## CLAUSE 50

The Owners undertake that all vessel's equipment shall conform to regulations in all ports visited by the vessel, and that the vessel is at all times in possession of valid certificates connected with above equipment to comply with such regulations.

## CLAUSE 51

Owners warrant that the vessel has not traded Israel and is not blacklisted by Arab countries, provided that Charterers do not, during the currency of this Charter, order the vessel to a port/place causing her to be so blacklisted, and that the vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with US Department of Commerce, Office International Trade, Directive No. 705.

## CLAUSE 52 -- POLLUTION CHARTER PARTY CLAUSE

Financial responsibility in respect of pollution (all ships other than self-propelled tank vessels and non self-propelled tank vessels carrying more than 2,000 tons of persistent oil in bulk as cargo.)

(1)   Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:

Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from 16th May, 2000, so long as these can be obtained by the Owners under the present conditions. Owners to remain responsible for all consequences that may occur including extra expenses and/off off-hire periods for the vessel as a result of not having such valid and upto date certificates on board at all times during the currency of this Charter.

(2)   Notwithstanding anything whether printed or typed herein to the contrary,

6

**Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

(a)    save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b)    Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including, but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c)    Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other that to the extent provided in paragraph (1) hereof.

(3)    Charterers warrant that the terms of this clause will be incorporated effectively into any Bill of Lading issued pursuant to this charter.

## CLAUSE 55

By giving due advance notice to Owners and obtaining Owners' Hull Underwriters' prior approval, which, however, shall not be unreasonably withheld. Charterers shall have the privilege to breach the Institute Warranty Limits upon payment by them of any additional insurance premium, as quoted by Owners' insurance company which understand equivalent to London Joint Hull Committee minimum scale. (See Clause 25).

## CLAUSE 54

Deleted.

## CLAUSE 55 -- OUTBREAK OF WAR

In the event of outbreak of war between any of the following countries:

United States of America, the country of vessels' flag, Russia, Communist China, United Kingdom, Japan, France, Germany, Belgium, Denmark,-

both Charterers and Owners have the option of cancelling this Charter Party.

**⚓ Fearnleys**

### ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
### CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

It is understood that war means direct war between these nations and does not include local hostilities or civil war where any of the above countries support opposing sides. Owners shall not unreasonably take advantage of this Clause in case of limited local conflict.

## CLAUSE 56 – WAR RISK INSURANCE PREMIUM

The basic war risk insurance premium on the vessel's Hull and Machinery value and present war bonus to the Master, Officers and crew, are for Owners' account, but any increase of same due to vessel's trading into an excluded area to be for Charterers account.

## CLAUSE 57 – BILLS OF LADING / CARGO CLAIMS

This Charter is subject to the New Jason Clause, New Both-to-Blame Collision Clause, Hague Rules, Conwartime Clause as attached, which are to be incorporated in all Bills of Lading issued under this Charter.

All Bills of Lading issued under this Charter will incorporate General Paramount Clause as attached, or U.S. Paramount Clause for cargoes to/from U.S.A.

## CLAUSE 58 – TRADE EXCLUSIONS

Worldwide trading within Institute Warranty Limits, excluding North Korea, Cambodia, Cuba, Israel, Libya, C.I.S. Pacific ports, Syria, Lebanon, Orinoco River, Cyprus, Namibia, Nicaragua, Albania, Eritrea, Haiti, Iraq, except for U.N. approved cargoes, Kampuchea, Russian Siberian ports, Yugoslavia or countries which formerly constitute same (but Slovenia and Croatia allowed) provided no additional premium and war bonus applicable, Nigeria, Liberia, Ethiopia, Sudan, Somalia, Yemen, Angola including Cabinda, Zaire, no countries where war or warlike activities exist in accordance with Lloyd's of London Panel Dictate.

For trading to and from Amazon, the vessel not to go off-hire for any delay and/or stoppage and/or default whatsoever caused by delay in deballasting, stoppages and/or delays during the voyage on the River due pilots' request and/or waiting for tide/high water and/or other navigational hindrances except for delays due to vessel's default.

## CLAUSE 59 – CARGO EXCLUSIONS

Livestock, injurious, inflammable or dangerous goods as defined by I.M.O. (such as but not limited to acids, explosives, black powder, blasting caps, bombs, dynamites and TNT), also excluding ammonium nitrate (unless fertilizer grade which to be allowed), ammunition, arms, asbestos, asphalt and pitch in bulk, bones, borax, calcium carbide, calcium hypochlorite, bulk cement, cement clinker, charcoal, copra, cotton, creosoted goods, deck cargo, fishmeal, hides, direct reduced iron, logs, motor blocks and turnings, naphtha, nuclear fuels and materials, petroleum or any of its

8

**✄ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

products, but petcoke allowed, yellow phosphorus, pyrites, radioactive products and wastes, resin, milled rice in bulk, salt, scrap, ferro silicon, soda ash, sulphur, sunflower seed expellers, tar or any of its products, wood pulp.

Steel or any of its products allowed, provided same loaded according to I.M.O. Rules/ Regulations in conformity with tank-top strength and always excluding any kind of scrap.

Owners confirm vessel is CO2 fitted in all holds but CO2 can be used in maximum two (2) holds at same time. Charterers' liberty load maximum two (2) holds of oilcakes within I.M.O. Class 4.1 and 4.2 always subject to I.M.O. limitations/ regulations and recommendations.

All cargoes to be loaded stowed and discharged in accordance with I.M.O./Solas Recommendations or Code of Safe Practice for solid Bulk Cargoes.

Charterers can perform every twelve (12) months following cargoes:

- 1 salt cargo plus 1 sulphur cargo plus 1 cement clinker cargo or, in Charterers' option,
- 2 sulphur cargoes plus 1 cement clinker cargo, or in Charterers' option,
- 2 cement clinker cargoes plus 1 sulphur cargo;

Above cargoes not to be performed on consecutive basis.

For the carriage of salt or sulphur or clinker in case shore regulations and/or Shippers do not permit and/or time between voyages does not allow crew to do the whitewashing removal of whitewashing, limecoating or removal of limecoating, then Charterers to arrange at their time, risk and expenses the necessary to do so up to Master's satisfaction.

The Master and crew, although not responsible for the result of hold cleaning to render all customary assistance with regard to hold cleaning and will provide sufficient equipment and men to ensure that holds are cleaned without unnecessary delay.

In case of loading salt cargoes, clinker or sulphur cargo holds are to be lime coated for each voyage by crew at Charterers' time and expense prior to loading. Equipment and materials for same to be supplied by Charterers.

California block stow allowed only once every twelve (12) months.

Sulphur Clause
a)    Holds to be thoroughly washed by vessel's crew with fresh water before loading and after discharge at Charterers time.
b)    Subject to the provisions below, limecoating or holdblock (provided holdblock will have the same effect of limecoating) of holds for the carriage of sulphur,

9

**✖ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

whether requested by Shippers or Charterers or Owners, to be arranged by
vessel's crew at Charterers' time.

c)   Similar procedures to apply for the limecoating removal.

## CLAUSE 60 – NOTICES

Delivery:
Owners to give Charterers the following notices:
30/20/15/10/5/3/2/1 day(s) notice of delivery date and place.

Redelivery:
Charterers to give Owners the following notices:
45 days notice for redelivery range.
30 days notice of probable redelivery date and range,
15 days approximate notice of redelivery date and port,
5 days definite notice of redelivery date and port.

## CLAUSE 61 – DRY DOCKING

Owners shall have the option to place the vessel in dry-dock during the currency of
this Charter at a convenient time and place in Singapore-Japan range including
Taiwan, Hong Kong, P.R. China, Thailand, South Korea, full Malaysia, Indonesia,
Philippine Island and including their islands for bottom cleaning and painting and/or
repair as required by class or dictated by circum stances. Payment of hire shall be
suspended upon deviation from Charterers' service until vessel is again placed at
Charterers' disposal at a point not less favourable to Charterers than when the hire
was suspended. Except in case of emergency, Owners to give to Charterers six (6)
months notice of a two (2) months window during which vessel need by dry-docked
in Far East as above.

## CLAUSE 62 – STEVEDORE DAMAGE

All stevedore damages to be settled directly between Owners and Stevedores.
Charterers will assist Owners to recover eventual stevedores damages, only when
notified in writing by the Master at the time of occurrence of damage or latest within
24 hours thereafter. Master is to cooperate with Charterers and Agents in giving
prompt notice of claim in writing to party causing same latest before sailing. Upon
each occurrence of damage subject that such is practical a joint survey to be held in
Charterers' time and for their account, in case Charterers are responsible for such
damage, otherwise in Owners' time and for their account. The Master is to use his
best efforts to obtain written acknowledgement by responsible parties causing damage
unless damage be made good in the meantime by stevedores otherwise Charterers are
not held responsible.

**Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

## CLAUSE 63 – CARGO HOLDS

In case any special operation beyond customary assistance by crew is requested by Charterers, Owners to accept such subject to remuneration which shall be agreed between Charterers and Owners with amount depending upon nature of work, which should not be unreasonably withheld and provided shore regulations and time permit.

In the event crew perform hold sweeping only upon Charterers' request Charterers to pay USD 425,- per hold used after grain/iron ore and USD 525,- per hold used after other cargoes and in case sweeping and washing Owners to receive USD 600,- per hold.

The Master and/or crew to try to do their best to pass cleanliness survey or the likes. In case the vessel fails to pass hold survey and shore labour is required by any governmental authority such charge to be for Charterers' account and time.

Vessel to present at first intended loading port with holds/hatches and hatchcovers clean, dry, free of loose paint/rust and/or scale as well as free of residues of her previous cargo, and in all respects ready to load intended cargo to surveyors/ authorities' satisfaction, otherwise vessel to be off-hire from time of rejection until fully accepted.

## CLAUSE 64 – BALLASTING

Charterers have the right to instruct Master to utilize the vessel's maximum water ballast capacity and eventually to flood no. 4 hold only but limited to 90% of the full capacity in order to bring down vessel's height to get into position under loading and/or discharging appliances, however, always in conformity to free board and/or safety requirements.

## CLAUSE 65 – AGENCY

Charterers agree to have their agents attend, if required by the Owners, all Owners' matters. Owners in such case to refund agents, outlays and to pay them customary agency fee in full, but normal ship's husbandry (immigration, crew mail, cash advance) which shall be taken care of by Charterers' agents without agency fee.

## CLAUSE 66 – FUNNEL/MARKS

Charterers have the privilege of flying their houseflag.

## CLAUSE 67

All reference to time is understood to be in GMT.

11

**⚓ Fearnleys**

## ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
## CHARTER PARTY DATED 11TH JULY, 2007

### CLAUSE 68 – BILL(S) OF LADING

If required the Charterers to use their own Bill(s) of Lading.  With reference to Lines 78/79 of the Charter Party, the Charterers and/or their Agents, are authorised by the Owners to sign on Owners' behalf all Bill(s) of Lading as presented in accordance with Mate's or Tally Clerk receipts without prejudice to this Charter party, but the Charterers are to accept all consequences that might result form the Charterers and/or their Agents not adhering to the remarks in Mate's/Tally Clerk's receipts.

The Charterers have the right to discharge part or full cargo without presentation of the Bill(s) of Lading against signing Letter of Indemnity s in Owners' P. & I. Club's form, as attached herewith, submitted to the Master that the Owners are not to be responsible for any consequences resulting from such discharge.

A copy of the original Letter of Indemnity to be sent to the Owners on fax.

### CLAUSE 69 – BIMCO DOUBLE BANKING CLAUSE

(a)     The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside and such safe dock, wharf, anchorage or other place for trans-shipment, loading or discharging of cargo and/or bunkering.

(b)     The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c)     Without prejudice to the generality of the he Charterers' rights under (a) and (b) it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d)     The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(e)     The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including period for repairs as a result of such operation.

### CLAUSE 70 – ARGENTINA

If the vessel when finished her loading cannot sail because of the lack of water she must allow another vessel to take elevator berth herself going second-off in order to

12

**☒ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

wait sufficient tide for sailing and/or receive another vessel second-off as instructed
by Charterers' Agents. If tug assistance to the vessel is required in Argentinean ports
the ropes which are to be used in the operations must be supplied by the towed vessel.
The Owners guarantee that the vessel is fully able to load and sail with a part cargo of
bulk grain on a draft of 31/6" fresh water without stability problems and no bagging
and/or strapping will be required.

Above is subject to:
A)    Four holds to be fully laden with bulk grain
B)    Partly laden hold to be restricted to one hold
C)    Two holds always to remain empty.

## CLAUSE 71

In order to ascertain bunker quantity remaining on board and condition of holds, hull
and machinery, joint on-hire and off-hire surveys are to be performed with the cost of
same to be split equally (50/50) between Owners and Charterers, on-hire survey to be
in Owners' time and off-hire survey to be in Charterers' time.

## CLAUSE 72 – HOLD CLEANING

The holds on redelivery to be clean swept but Charterers have the option to redeliver
the vessel with holds as discharged in lieu of which Charterers to pay lump sum of
USD 5,000.- excluding removal of dunnage, if any, and if petcoke last cargo then
USD 10,000,- and Charterers to be free from time/expenses.

## CLAUSE 73 – REDELIVERY

Vessel to be redelivered to Owners:
On dropping last outward sea pilot Skaw/Passero range or in Charterers' option on
dropping last outward sea pilot/passing one safe port Aden – passing Muscat
outbound/Japan range, at any time day, night, Sundays and holidays included.

## CLAUSE 74

Charterers to have the privilege of ordering the vessel to be laid up at any time during
the period of this Charter party at a safe berth of place and in such a manner as
mutually agreed upon and acceptable to the vessel's Hull Underwriters. At the request
of Charterers and on their indicating likely lay up position and duration, Owners shall
at any time provide an estimate of the economies which may be possible in the event
of the laying up of the vessel. Such estimate shall not however be binding upon
Owners. In the event of such laying up, Owners shall take steps to effect all
reasonable economies in operating costs including signing off of crew, reduction in
the scope of insurance cover (but not on insured values) etc. and to give prompt credit
to Charterers in respect of all such economies in the form of a reduction in the hire
payable, but only to the extent of the financial savings to Owners (which shall be

13

**✗ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

substantiated to Charterers by a written statement by Owners) as may be actually achieved. Hire shall continue to be paid throughout the period of lay up. All costs and extra costs for putting the vessel in a lay up position and condition, during lay up and on reactivation to be in Charterers' time and at their expense; such extra costs to include, but not limited to cost of crew repatriation, indemnities payable to the crew, cost of crew rejoining, dry-docking and repainting the vessel underwater parts etc. Charterers to give sufficient notice (i.e. not less than 30 days) of their intention to lay up the vessel and sufficient notice (i.e. not less than 30 days) of their intention to reactive her. Owners shall try, but without any responsibility on their part, to make necessary arrangements for decommissioning and re-commissioning within 30 days period. In the event that the vessel is in laid up condition 45 days before the expiration of this charter, Owners have the option, in Charterers' time and at Charterers' expense to reactive/re-commission the vessel or debit Charterers with the estimated cost and time involved.

**CLAUSE 75**

Deleted.

**CLAUSE 76**

Owners agree that liability for cargo claims, as between Owners and Charterers, shall be applied as specified by the Inter Club Produce Exchange Agreement effective from February 20, 1970, and any amendments thereto.

**CLAUSE 77**

In the event that prohibited drugs are found in cargo equipment or other property loaded by Charterers, their servants or agents, or are found on the person or in possession of effects of Charterers' servants or agents Charterers shall remain responsible for all and any fines and expenses and for detention of the ship. The ship shall not go off-hire as a reason of any delay or stoppage resulting from the above Owners only to be responsible for smuggling by Master, Officers or crew. Owners confirm that the vessel shall institute and maintain throughout the term of charter procedures recommended by U.S. Coat Guard Sea Carrier Initiative Agreement.

All time involved in implementing such procedures to be for Charterers' account, unless vessel is already off-hire. Vessel shall not be off-hire whilst vessel complies with S.C.I.A. provision provided vessel is on-hire under provision of this Charter Party.

**CLAUSE 78**

If vessel remains idle, due to Charterers' trading, for a period of thirty (30) or more consecutive days, than Charterers to arrange for underwater bottom's inspection to

14

**⚓ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO".
CHARTER PARTY DATED 11TH JULY, 2007

ascertain whether fouling occurred, in which case Charterers to arrange for underwater cleaning of vessel's hull at their cost and time.

### CLAUSE 79 – MOBIL CRANE CLAUSE

With Owners prior consent, which not to be unreasonably withheld, Charterers have liberty to place mobile cranes on deck to facilitate discharge of cargo, all costs, time and risks to be for Charterers' account, and sufficient dunnage (if required by Classification Society or Master) to be placed underneath the cranes to spread the weight which in any case not to exceed permissible deck strength.

Should any cutting or welding or reinforcement be necessary on vessel's hatches to accommodate the placement of such cranes on deck then risk, expenses and time of such work to be for Charterers' account, and such works always to be carried out subject to Classification society Surveyors' approval. Charterers will be full responsible for any and all damages, time, expenses and costs (including but not limited to all burn area of paints on deck and underneath which to be reconditioned to original state prior to redelivery, normal wear and tear expected) and that all works to be under Master/Officers' supervision and to Classification Society's and Master's satisfaction.

It is understood that Charterers shall in any case always have the right to place mobile cranes on-board to facilitate discharge in Taiwan, provided always in conformity with this Clause.

### CLAUSE 80 – COMMUNICATION / ENTERTAINING / VICTUALLING

Charterers to pay Owners a lump sum of USD 50.- per day pro rata, which shall cover all costs for cable/phone calls/victualling and representation as per lines 84/85 of first page of this Charter Party. Master to send all cables as requested by Charterers/Sub-Charterers.

### CLAUSE 81 – BIMCO STANDARD YEAR 2000 CLAUSE

N/A

### CLAUSE 82 – BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

15

**Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

Except as otherwise provided in this Charter party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

## CLAUSE 83

Negotiations, any subsequent fixture and/or any disputes arising hereunder shall be governed and construed in accordance with English Law, both regarding substance and procedure in London.

## CLAUSE 84

Negotiations and any subsequent fixture to be kept strictly private and confidential.

## CLAUSE 85

Prior to delivery of the vessel, Owners are to provide Charterers with copies of the vessel's capacity plan (including dead-weight scale) and general arrangement plan.

## CLAUSE 86

According to the Italian law for privacy the Owners have available the SMS Safety Management Manual covering the drug alcohol control.

## CLAUSE 87

Vessel to supply a Dual Tonnage Certificate if requested by Charterers throughout the Charter period.

## CLAUSE 88

The Charterers shall have the option to inspect the vessel at any time during the period of the Charter party and the Master/Officers and crew to render all necessary cooperation.

## CLAUSE 89 – ASIAN GYPSY MOTH

Owners guarantee that the vessel has not traded to/from the C.I.S. Pacific ports within last 12 months. Furthermore, Owners to guarantee that the vessel on delivery meets all Agricultural Canada Plan Protection Division and U.S.D.A. Plant Protection and Quarantine Office Regulations connecting Asian Gypsy Moth.

Furthermore Owners guarantee that the vessel is free of any Asian Gypsy Moth egg or larvae or any form of Asian Gypsy Moth life at time of delivery.

**✗✗ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

On delivery should the vessel be found to have same, vessel to be considered off-hire until the vessel's holds has been passed. All costs, consequences, losses, damages to be for Owners account.

If, after delivery, vessel is trading to any area with risk of infecting the vessel with Asian Gypsy Moth eggs or larvae or any form of Asian Gypsy Moth live and after same are found ob board the vessel then Charterers to be responsible.

## CLAUSE 90

Charterers shall be discharged and released form all liability in respect of any claim or claims which Owners may have under this Charter Party and such claims have been notified in details to Charterers in writing accompanied by all available supporting documents within nine (9) months from completion of discharge of the appropriate cargo under this Charter Party.

## CLAUSE 91

The Charterers have the option of providing the vessel with Ocean Routes Weather Routing service with all costs in this respect for the account of the Charterers. The Master at his reasonable discretion may not follow the suggested route, in which case he is detail in the log book the reason for departing, from same and advise Charterers accordingly. The Charterers are to instruct the Master to keep Ocean Routes fully advises of the vessel's actual time of departure, daily position and actual time of arrival.

## CLAUSE 92

Head Owners to have the option to sell the vessel any time from the date of present Charter Party.

## CLAUSE 93 -- SEAWAY BILL CLAUSE

Charterers and/or their Agents may issue and sign non-negotiable Seaway Bills in lieu of Bills of Lading for those Shippers for discharge in Japan only with whom Charterers have contracts allowing or requiring Seaway Bills to be used. Charterers hereby indemnify Owners and hold them harmless I respect of any liability, loss, damage or expenses by reason of the cargo being so delivered by Seaway Bills.

Cargo to be released at discharging port(s) smoothly without presentation of any documents including Seaway Bills/L.O.I. to Master.

## CLAUSE 94

With reference to Clause 29, speed and consumption are to be considered basis upto and including Beaufort 4 and Douglas Sea State 3.

17

**⚓ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

## CLAUSE 95 – ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)    (i)   From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide, a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)   Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)    (i)   The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)   Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

- - End - -

18

**Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR
DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILL OF
LADING

To:     [insert name of Owners]                                    [insert date]
        The Owners of the [insert name of ship]
        [insert address]

Dear Sirs

Ship:           [insert name of ship]
Voyage:         [insert load and discharge port as stated in the bill of lading]
Cargo:          [insert description of cargo]

Bill of lading: [insert identification numbers, date and place of issue]

The above cargo was shipped on the above ship by [insert name of shipper] and consigned
to [insert name of consignee or party to whose order the bill of lading is made out, as
appropriate] for delivery at the port of [insert name of discharge port stated in the bill of
lading] but the bill of lading has not arrived and we, [insert name of party requesting
delivery], hereby request you to deliver the said cargo to [insert name of party to whom
delivery is to be made] at [insert place where delivery is to be made] without production
of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:

1)      To indemnify you, your servants and agents and to hold all of you harmless in respect
        of any liability, loss, damage or expense of whatsoever nature which you may sustain
        by reason of delivering the cargo in accordance with our request.

2)      In the event of any proceedings being commenced against you or any of your servants
        or agents in connection with the delivery of the cargo as aforesaid, to provide you or
        them on demand with sufficient funds to defend the same.

3)      If, in connection with the delivery of the cargo as aforesaid, the ship, or any other
        ship or property in the same or associated ownership, management or control, should
        be arrested or detained or should the arrest or detention thereof be threatened, or
        should there be any interference in the use or trading of the vessel (whether by virtue
        of a caveat being entered on the ship's registry or otherwise howsoever), to provide
        on demand such bail or other security as may be required to prevent such arrest or
        detention or to secure the release of such ship or property or to remove such
        interference and to indemnify you in respect of any liability, loss, damage or expense
        caused by such arrest or detention or threatened arrest or detention or such
        interference, whether or not such arrest or detention or threatened arrest or detention
        or such interference may be justified.

4)      If the place at which we have asked you to make a delivery is a bulk liquid or gas
        terminal or facility, or another ship, lighter or barge, then delivery to such terminal,
        facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we
        have requested you to make such delivery.

19

**≋ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

5)    As soon as all original bills of lading for the above cargo shall have come into our
possession, to deliver the same to you, or otherwise to cause all original bills of
lading to be delivered to you, whereupon our liability hereunder shall cease.

6)    The liability of each and every person under this Indemnity shall be joint and several
and shall not be conditional upon your proceeding first against any person, whether or
not such person is party to or liable under this indemnity.

7)    This indemnity shall be governed by and construed in accordance with English Law
and each and every person liable under this Indemnity shall at your request submit to
the jurisdiction of the High Court of Justice of England.

Yours faithfully
For and on behalf of
[Insert name of Requestor]
The Requestor


...................................
Signature


## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of
the voyage, resulting from any cause whatsoever, whether due to negligence or not,
for which, or for the consequences of which, the carrier is not responsible, by statute,
contract or otherwise, the goods, shippers, consignees, or Owners of the goods shall
contribute with the carrier in general average to the payment of any sacrifices, losses,
or special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully
as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his
agents may deem sufficient to cover the estimated contribution of the goods and any
salvage and special charges thereon shall, if required, be made by the goods, shippers,
consignees or Owners of the goods to the carrier before delivery and the Charterers
shall procure that all Bills of Lading issued under this Charter Party shall contain the
same Clause.


## BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this
Charter Party fails to be determined in accordance with the laws of the United States
of America, the following clause shall apply;


## NEW BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the
other ship and any act, neglect or default of the Master, mariner, pilot or the servants
of the carrier in the navigation or in the management of the ship, the Owners of the
goods carried hereunder will indemnify the carrier against all loss or liability to the
other or non-carrying ship or her Owners insofar as such loss or liability represents

20

**⚓ Fearnleys**

### ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO" CHARTER PARTY DATED 11ᵀᴴ JULY, 2007

loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or carrier or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provision shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

The Charterers shall procure that Bills of Lading issued under this Charter Party shall contain the same clause.

**BIMCO Standard War Risks Clause for Time Charters, 1993**
**Code Name: "CONWARTIME 1993"**

1.    For the purpose of this Clause, the words:

    a)    "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    b)    "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

2.    The vessel, unless in written consent of the Owners be first obtained, shall not be ordered to or be required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons onboard the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade to be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

21

**✲✲ Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

4.   a)   The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

       b)   If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same as the next payment of hire is due.

5.   If the Owners becomes liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6.   The vessel shall have liberty:

       a)   to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power of compel compliance with their orders or directions.

       b)   to comply with the order, directions or recommendations of any war risks Underwriters who have the authority to give the same under the terms of the war risks insurance.

       c)   to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

       d)   to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier.

**Fearnleys**

ADDITIONAL CLAUSES TO M/V "GIANFRANCA D'AMATO"
CHARTER PARTY DATED 11TH JULY, 2007

e) to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7) If in accordance with their rights under the foregoing provisions of this Clause the Owners shall refuse to proceed to the loading or discharging ports or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

GENERAL CLAUSE PARAMOUNT
All Bill(s) of Lading issued under this Charter Party shall contain the following Clause:

"The Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bill of Lading contained in the International Convention, dated Brussels 25th August, 1924, and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder, If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability."

U.S.A. CLAUSE PARAMOUNT
This Bill of Lading shall have effect, subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the carrier.

23



Exhibit C

**MAZZA, CLARE**

| | |
|---|---|
| **From:** | UNI Marine - HS Park [hspark@unimaco.com] |
| **Sent:** | Tuesday, August 11, 2009 8:34 PM |
| **To:** | Kookyang, Biz2; Kookyang-Mr. K.D. Yang |
| **Subject:** | Fw: Confirmed MV.TOPEKA |

----- Original Message -----
From: "□□□"
To: "□□□□□□"
Sent: Wednesday, August 12, 2009 9:14 AM
Subject: Fw: Confirmed MV.TOPEKA

□□ □□ □□□ □□□□ 10%□ □ □□ □□ □□□ □□□ □□□□□ confirm□ □□ □□□□.

□□□□ □□ □□□□.

          ---- Original Message ----

          From : Young Sik Kwon
          To : □□□, kang kyung joo
          Sent : Wednesday, Aug 12, 2009 03:23 AM

          Subject : Re: Confirmed MV.TOPEKA


          □□□□,
          □□□□□□ □□ □□□□. □□□ 10%□□□□ 66,000□□ □□□ □□ □□□□.
          □□□□ □□□ □□ □□ □□ □□ □□□ ... □□ □□□□□.
          □□□□ □

          ---------------------------------------

          From: □□□
          To: Young Sik Kwon
          Sent: Wednesday, August 12, 2009 1:09:49 AM
          Subject: Re: Confirmed MV.TOPEKA

          □□□ □/n□□ □□□□□ 10% more □□□ □□□□□□ □□□ □□□ □□□.

          □□(12□) □□ 11□□□ □□ □□□ □□□□□ □□ □□ □□ □□□ □□□□ □□□ □□□□.

          □□ □□ □□□□.


                    ---- Original Message ----

                    From : Young Sik Kwon
                    To : □□□
                    Cc : kang kyung joo, Ahmad Jamal
                    Sent : Wednesday, Aug 12, 2009 02:47 AM
                    Subject : Confirmed MV.TOPEKA

                                        1

□□□□ □□□□□ □□□ □□□□□ □□□ □□ □□□□□□□ □□□□□□□.

□□□□□□ / □□□ □□
□□□□ / □□□□□□□□

<http://mail2.nate.com/rsd/empalrcpt2.html/921609/10841/kwon_youngsik@yahoo.com/foo.gif>

<http://mail2.nate...com/rsd/empalrcpt2.html/921609/10858/kwon_youngsik@yahoo.com/foo.gif>

<http://mail2.nate.com/rsd/empalrcpt2.html/921609/10866/unimarine@unimaco.com/foo.gif>



Exhibit D

MAZZA, CLARE

| | |
|---|---|
| **From:** | Yong-Suk Yang [hrs.pmx@howerobinson.com] |
| **Sent:** | Friday, August 21, 2009 5:44 AM |
| **To:** | Kookyang |
| **Subject:** | Re: MV TOPEKA / NCS- DATED 21ST AUG 2009 - CLEAN RECAP |

**Attachments:**    20090223211342725.pdf



20090223211342/2
5.pdf (2 MB)

HOWE ROBINSON SHIPBROKERS - Panamax Dept.

E-mail: hrs.pmx@howerobinson.com
YSY71558758    21/08/2009    10:43:51

KD / YS


RE: MV TOPEKA    / NCS
====

PLSE TO CONFIRM WE ARE CLEAN FIXED WITH CP DD 21ST AUGUST 2009 AS FOLLLOWS:

++   STRICTLY PRIVATE AND CONFIDENTIAL   ++

MV. TOPEKA
-----------
74,710 MT DWT ON ABT 14.268 M SSW
TPC 67.07
MALTA FLG - BLT 2001
LOA/BEAM 32.26 M / 225 M
7 HO / 7 HA
91,717.3 CMB GRAIN CAPACITY
SPEED / CONS UPTO AND INCL BEAUFORT 4 AND DOUGLAS SEASTATE 3 :
ABT 14 KTS ON ABT 34 / 31 MT IFO 380 L/B NDAS IN PORT ABT 2.5 MT  MDO (ALL DETS +ABT+)


FOR

1. A/C : NCS SHIPPING FAREAST COMPANY LIMITED

2. OWS : KOOKYANG SHIPPING CO. LTD

3. DELY: DLOSP TAICHUNG 2120LT 18TH AUG WITH IFO 1292.8MT / 61.1MT

4. ONE TCT VIA SA(S),SB(S),SP(S) AA,AW1WL VIA E.C INDIA (INT. L/P
   KRISHNAPATNAM, INT. D/P --RVTING,MAY ONLY KNOW AFT LOADING.)
   TO CHINA
   WITH LAWFUL/HARMLESS IRON ORES IN BULK. EST DUR ABT 25-30 DAYS WOG

5. REDEL : DLOSP 1SP CHINA PICO ATDNSHINC

6. HIRE : USD 15,500 DIOT

7. 1ST HIRE 15 DAYS WITH ESTIMATED CONSUMABLE BUNKER VALUE TO BE PAID
   W/I 3 BANKING DAYS FM DELY.

   CHRTRS HAVE THE RIGHT TO DEDUCT BOR VALUE FM LAST SUFFICIENT HIRE.

8. ILOHC : USD 5,500 LUMPSUM

1

C/E/V : USD 1,300 PMPR

9. BUNKER CLS :
   BOD: IFO ABT 1250/1350MT, MDO ABT 65/75 MT
   BUNKER ON REDLY: ABT SAME QUANTITY AS ON DELY
   BUNKER PRICE BENDS: IFO USD 480PMT MDO USD 630PMT

10. THE VESSEL'S HOLDS ON ARRIVAL FIRST LOADPORT TO BE CLEAN, SWEPT, AND
    DRIED UP AND READY TO RECEIVE CHARTERERS' INTENDED CARGO AND SHOULD
    PASS THE INDEPENDENT SURVEYOR'S INSPECTION. IF VESSEL FAILS TO PASS
    HOLD INSPECTION, VESSEL TO BE PUT OFF-HIRE FROM THE TIME OF FAILING
    OF CARGO HOLD INSPECTION UNTIL PASSING RE-INSPECTION AND DIRECTLY

    TIME/EXPENSES CAUSED THEREBY TO BE FOR OWNRS ACCOUNT.

11. IF THE ORIGINAL B/L CAN NOT BE PRESENTED AT DISPT, OWRS/MSTR
    AGREE TO DISCHG/RELEASE THE ENTIRE CGO W/OUT PRESENTATION OF
    THE ORIGINAL BSL AGAINST CHTS LOI IN OWRS STANDARD PNI FORM
    SIGND BY CHTRS ONLY.

12. GA/ARBITRATION LONDON, ENGLISH LAW TO APPLY

13. 3.75 PCT ADDCOMM + 1.25 PCT HRS

14. OTHERWISE ASPER CP MV. TOPEKA DTD 11TH JULY 2007
    WITH LOGICAL ALTERATIONS AND THE FOLLOWING AMENDMENTS:

RIDERS
=======

- CLAUSE 60:
   DELETE: 45DAYS NOTICE FOR REDELIVERY RANGE.
          30DAYS NOTICE OF PROBABLE REDELIVERY DATE AND RANGE.
   CHANGE THE LINE OF " 15DAYS ---" TO:
   15DAYS APPROXIMATE NOTICE OF REDELIVERY DATE AND PROBABLE PORT.


END

==================================================================
Post-fixture matters will be handled by: JULIETA LEUNG

All post-fixture messages should be addressed to:
E-Mail: hrs.opsfeast@howerobinson.com
Fax   :   +852 2529 8378
Phone :   +852 3555 1000

Dry P-F Contact details
                    Direct                Mobile
Julieta Leung       +852 3555 1177        +852 9773 2960

1.25PCT commission to Howe Robinson Shipbrokers is to be inserted in C/P.

Please note we will be collecting our commission from Chtrs and will debit them
accordingly.
==================================================================

Many Thanks yr continued kind support and patience throughout in concluding this fixture

RGDS/YS YANG




Tel / Fax:

```
==============================================
London      +44 20 7488 3444  /   +44 20 7457 8799
Hamburg     +49 40 2263 0830  /   +49 40 226308399
Hong Kong   +852  3555 1000   /   +852  2529 8378
Tokyo       +81 3 3583 9768   /   +81 3  3584 6266
Shanghai    +86 21 3318 4550  /   +86 21 6391 0708
==============================================
```

E-mail: hrs.pmx@howerobinson.com

This e-mail and any attachments are believed to be free from viruses but it is your responsibility to carry out all necessary virus checks. Howe Robinson Shipbrokers accepts no liability for any damage caused by any virus transmitted by this e-mail.